ATCHISON, T. & S. F. R. CO. v. MYERS, Adm'x.

No. 26663. March 9, 1937.

Rehearing Denied April 27, 1937.

Rainey, Flynn, Green & Anderson and Andrews & Andrews, for plaintiff in error.

Embry & Embry, W. P. Morrison, and John Morrison, for defendant in error.

HURST, J. Plaintiff brings this action to recover damages for the death of her husband, Robert W. Myers, who was killed while painting a railroad bridge for the defendant. He was working on a scaffold suspended from the top of the bridge and was about 20 feet above the tracks. The scaffold was fastened to the side of the bridge and was clearly out of the way of passing trains. The painting was done by means of a spray gun operated by compressed air furnished by a compressor located at one end of the bridge. From this compressor a metal air line was laid along the ties across the bridge and there were places at regular intervals where rubber hose connecting the paint guns could be plugged into the line. At the time of the accident, Myers had his rubber hose plugged into the metal line directly beneath the scaffold upon which he was working. This hose was tied near the bottom of the bridge to one of the upright supports, and tied again at a point about on a level with the scaffold, so that the hose was held to the side of the bridge out of the way of passing trains. Another hose, called a suction hose, was also connected to the spray gun and ran from it to a paint bucket, which was located at the top of the bridge about five feet directly above the scaffold. From where these two hose were fastened, there was a loop of slack to the gun held by Myers so as to allow free movement in painting. This loop, however, if properly handled, would not extend down in the path of the trains while the paint gun was being operated. The men arranged their own scaffolding and air lines to suit the job. The method commonly used by the painters was to loop the hose about twice around their arm to take up the slack, hold on to the bridge with one hand and paint with the other. Also, it was customary, when anyone saw a train coming, to shout "railroad," and this call would be repeated from one man to the other.

About noon, on the 13th of November, 1933, Myers descended from the scaffold to get some oil for his paint, and when he was on the bridge floor, he shouted "railroad," and then climbed back upon the scaffold and resumed painting. His associate on the scaffold descended and was standing on the bridge floor, with his back to Myers when the train passed, a few minutes later. After the train had gone by, the associate looked up and noticed that Myers was missing. His body was found under the bridge in the river bed. There were no eyewitnesses to the accident, but some paint and one of Myers' gloves were found on the top of the train, the paint gun and hose were broken, and the windshield on the engine was broken. Aside from these facts, there was no positive testimony as to how the accident actually occurred.

The evidence further disclosed that Myers was an experienced bridge and building painter, having been doing this type of work for about ten years. He had been working on this particular bridge for about two and a half months, five days a week, over which four to nine trains passed each day, according to the testimony of the various witnesses. The train in question crossed the bridge between 35 and 45 miles an hour, and was running on schedule at the same rate of speed it customarily traveled to maintain the schedule.

The railroad maintained block signals about a quarter of a mile from each end of the bridge to warn persons on the bridge of approaching trains, but there were no warning flags or signals of any kind to warn the train crew that men were at work painting the bridge. Testimony was introduced to the effect that on other railroads it was customary to use red and yellow flags to warn the train crew that men were working on the bridges or roads.

The jury returned a verdict for plaintiff for $12,000, upon which judgment was rendered, and the railroad company brings this appeal setting out 30 assignments of error. Plaintiff's action is based upon the Federal Employers' Liability Act, and therefore federal statutes and laws supersede the state laws applicable to this controversy. Chesapeake & Ohio R. Co. v. Kuhn (1931) 284 U. S. 44; Seaboard Ail Line Ry. v. Horton (1914) 233 U. S. 492; C., M. & St. P. R. Co. v. Coogan (1926) 271 U. S. 472.

1. Do these facts show any primary negligence on the part of the railroad? Plaintiff, in her petition, alleges three acts of negligence, in substance: First, defendant was negligent in failing to furnish its employees with a reasonably safe place to work and with reasonably safe tools and equipment; second, the fellow servant working with Myers in the employ of defendant was negligent in failing to tie the hose out of the way of

the train; third, defendant was negligent in failing to warn the train crew that men were working on the bridge and in failing to slow the train down in crossing the bridge. The evidence does not sustain the first and second allegations. There is nothing to indicate that the equipment was materially defective or different from that customarily used in this type of work. Moreover, each man arranged his own scaffolding and equipment and there is no evidence tending to show negligence on the part of the fellow servant in tieing the hose in any different manner than it had been tied for the two and one-half months previous. The third act complained of raises a different question. It has been consistently held by this court that there is no duty imposed on a railroad company to warn employees of the approach of the trains. Lancaster v. St. L. & S. F. R. Co. (1927) 128 Okla. 176, 261 P. 960, and cases therein cited. The duty to the employee is stated as follows:

"As to employees, the rule of this state is that a railway company must exercise reasonable care to avoid an injury, after the peril of the injured is discovered. But, as to such employees, there is no duty requiring the use of reasonable care in order to discover the peril of the injured or deceased, so long as there is no carelessness shown in the actual operation of the train."

In the case at bar, the deceased was working in the same place and manner as when previous trains had passed by without injury to him. The train crew did not discover the danger of deceased, and knew nothing about the accident until after it had happened. As there is no duty to use reasonable care in discovering the peril of the employee, there can be no duty on defendant to warn the operators of the train of the presence of the employees working on the road. Inasmuch as the peril of deceased was not in fact discovered, the operators of the train were not negligent in failing to decrease the speed of the train while crossing the bridge. The train was going at its customary rate of speed and was on its regular schedule. We can find nothing in the testimony tending to show any carelessness or negligence in the operation of the train.

2. Moreover, it is well settled that in order to recover under the Federal Employery' Liability Act, the evidence must show that the negligence complained of is the cause of the injury, and a verdict based on speculation or conjecture will be set aside. The jury will not be permitted to speculate as to the cause of the injury, and the case must be withdrawn from their consideration, unless there is evidence from which the inference may reasonably be drawn that the injury was caused by the negligent acts of the employer. N. W. Pac. R. Co. v. Bobo (1934) 290 U. S. 499, and cases therein cited. In the case at bar, there were no eyewitnesses to the accident. The evidence shows that Myers rigged up his equipment himself and tied his hose so that it would not catch upon a passing train as he had done on previous occasions. It further appeared that his equipment could not become entangled in the train when normally operated in the manner in which it was fixed at the time of the accident. We can no better express our view on this phase of the case than to quote from A., T. & S. F. R. Co. v. Saxon (1932) 284 U. S. 458:

"Nobody saw the accident; no one can say with fair certainty how it occurred. Consistently with the facts disclosed, it might have happened in one of several ways and without causal negligence by the petitioner. * * * What occasioned this distressing accident can only be surmised. It was necessary to show causal negligence in order to establish this respondent's right to recover. The evidence fails to meet this requirement."

We find, therefore, that the evidence fails entirely to show primary negligence, and further, that the verdict is based on mere speculation and conjecture. The court should have sustained defendant's demurrer to the evidence and instructed a verdict for defendant. Lancaster v. Frisco R. Co., supra.

3. Defendant strongly urges as a defense that Myers assumed the risk and thus would not be entitled to recover under the Federal Employers' Liability Act. Chesapeake & Ohio R. Co. v. Kuhn, supra; Seaboard Air Line Ry. v. Horton, supra; Toledo, St. L. & W. R. Co. v. Allen (1928) 276 U. S. 165; Chesapeake & Ohio R. Co. v. Leitch (1928) 276 U. S. 429; Atlantic Coast Line R. Co. v. Powe (1931) 283 U. S. 401; Baltimore & Ohio R. Co. v. Berry (1932) 286 U. S. 272; Lancaster v. Frisco R. Co., supra. The deceased had been engaged in this type of business for about ten years, and had been working on this particular bridge for two and one-half months. He arranged his own apparatus, knew when the trains came by and the speed they traveled, and he gave the warning of the approach of the train in question, before voluntarily going back onto the scaffold and resuming his work. Under these circumstances, he assumed the risk. The judgment is reversed, with instructions to render judgment for the defendant.

OSBORN, C. J., BAYLESS, V. C. J., and BUSBY, CORN, and GIBSON, JJ., concur.